UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YOUNTVILLE INVESTORS, LLC, a
Washington limited liability company,

    Plaintiff,

v.

BANK OF AMERICA, N.A., a national banking
association chartered in North Carolina,

    Defendant.

CASE NO. C08-425RSM

ORDER ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court for consideration of defendant's motion and supplemental motion for summary judgment.[1] Dkt. # 44, 92. Oral argument was held on April 24, 2009, but the Court reserved ruling until the parties could file supplemental memoranda addressing claims raised in plaintiff's amended complaint, which was filed with leave of Court prior to the oral argument. Dkt. # 86. The supplemental memoranda have now been filed. After careful consideration of the motion, response, and supporting declarations and exhibits, the Court shall grant the motions for the reasons set forth below.

---

[1] There is also a pending motion in limine to exclude the testimony of plaintiff's expert William Sarsfield. Dkt. # 73. The motion is rendered moot by the court's ruling on summary judgment. For the purposes of considering the summary judgment motion, however, the Court declines to exclude the expert report. Dkt. # 60, Exhibit B.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 1

# BACKGROUND

The facts are well-known to the parties and need only be summarized briefly. This action arises from an interest rate swap agreement between plaintiff Yountville Investors and Bank of America. The Ninth Circuit Court of Appeals has explained the nature and operation of interest swap agreements by providing the following "brief overview" of derivative swap agreements:

> A "swap" is a contract between two parties ("counterparties") to exchange ("swap") cash flows at specified intervals, calculated by reference to an index. Parties can swap payments based on a number of indices including interest rates, currency rates and security or commodity prices.
>
> The "plain-vanilla" interest rate swap, the simplest and most common type of swap contract, obligates one counterparty to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ("notional amount"), during a given period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first counterparty exceeds the floating rate paid by the second counterparty, then the first counterparty must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval. Conversely, if the floating rate paid by the second counterparty exceeds the fixed rate paid by the first counterparty, the fixed-rate payor receives payment. The agreed hypothetical or "notional" amount provides the basis for calculating payment obligations, but does not change hands.
>
> For example, suppose Counterparties A and B enter into a five-year interest rate swap with the following characteristics: (1) Counterparty A agrees to pay a floating interest rate equal to LIBOR, the London Interbank Offered Rate; FN2 (2) Counterparty B agrees to pay a 10% fixed interest rate; (3) both counterparties base their payments on a $1 million notional amount and agree to make payments semiannually. If LIBOR is 9% upon commencement of the first payment period, Counterparty B must pay A: (10%-9%) * $1 million * (.5) = $5,000. These net payments vary as LIBOR fluctuates and continue every six months for the term of the swap. If interest rates rise, the position of Counterparty B, the fixed-rate payor, improves because the payments it receives increase. For example, if LIBOR rises to 11% at the beginning of the next payment period, Counterparty B receives a net payment of $5,000 from A. Conversely, the position of Counterparty A, the floating-rate payor, improves when interest rates fall. The party whose position retains positive value under the swap is considered "in the money" while a party with negative value is considered "out of the money."
> As discussed previously, the $1 million notional amount never changes hands.
>
> > FN2. "LIBOR" stands for London Interbank Offered Rate, the rate at which top-rated banks in the European money market provide funding to each other. LIBOR is the most widely used floating index for interest rate swaps.
>
> Almost all interest rate swaps are documented with (1) a confirmation and (2) master agreement. Typically, master agreements are standard form agreements prepared by the International Swaps and Derivatives Association ("ISDA"). The master agreement governs all interest swap transactions between the counterparties. It includes provisions generally

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 2

> applicable to all swap transactions including: payment netting, events of default, cross-default provisions, early termination events and closeout netting.
>
> Most master agreements provide that, in the event of an early termination or default, the party in the money is entitled to collect "termination damages." Termination damages represent the replacement cost of the terminated swap contract and are generally determined by obtaining market quotations for the cost of replacing the swap at the time of termination. Some master agreements . . .do not permit the defaulting party to collect termination damages.
>
> Interest rate swap agreements provide a powerful tool for altering the character of assets and liabilities, fine tuning risk exposure, lowering the cost of financing or speculating on interest rate fluctuations. Borrowers can rely on interest rate swaps to reduce exposure to adverse changes in interest rates or to obtain financing characteristics unavailable through conventional lending. Interest rate swaps can modify a borrower's all-in funding costs from fixed-to-floating, floating-to-fixed or a combination of both.
>
> Interest rate swaps have become an important part of international and domestic commerce, and the market for these instruments has experienced explosive growth.

*Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n,* 322 F.3d 1039, 142-43 (9th Cir. 2003)

In 2006, Yountville Investors ("Yountville"), led by Phil Sherburne, began planning to build a luxury spa hotel, the Bardessano Inn, in a vineyard near Yountville, California. Yountville worked with Bank of America ("the Bank") to obtain a construction loan for the project. The amount of the contemplated loan was $30 million. As construction loans carry a variable interest rate, the Bank offered an interest rate swap which would have the effect of fixing the rate of the loan at a specific rate. The loan was scheduled to close in March, 2007, and Mr. Sherburne met with interest rate swap specialist Logan Taylor several times before that date to discuss the swap.

The proposed swap would provide a fixed interest rate on a notational amount of $30 million. If prevailing interest rates (using LIBOR) rose above the rate fixed in the swap, so that Yountville was paying a higher rate on the variable-interest construction loan, the Bank would pay Yountville the difference. Conversely, if prevailing interest rates dropped below the fixed rate on the swap, Yountville would owe the Bank. At the time this was being negotiated, in early 2007, it appeared that interest rates might rise over the term of the loan, and Mr. Sherburne decided to "lock in" a rate with a swap if he could get a rate of 5 % or better. In early March of 2007, as the loan closing date approached, the Bank offered a swap at 4.99 %, and the swap was executed.

The swap documents are in three parts: the ISDA Master Agreement, a Schedule to the Master

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 3

Agreement, and the Confirmation, which set a "trade date" of March 13, 2007. Declaration of Phil Sherburne, Dkt. # 20, Exhibits 6, 7, and 8. The parties proceeded to closing on the construction loan, but on March 22, 2007 the title company raised indemnity issues which the parties had to resolve first. The closing was re-scheduled for June 1, 2007. In the meantime, construction costs rose significantly, and Yountville needed to raise the amount of the loan. Yountville and the Bank negotiated over the increased loan amount with a projected closing date in October 2007. Eventually, the requested amount on the loan rose to $44 million and the Bank declined to fund the loan. Yountville Investors turned elsewhere for their construction loan, and obtained it from Zions Bank. The Bardessano Inn and Spa was completed and opened for business in February, 2009.

The interest rate swap has been in place since March of 2007. Initially, interest rates rose above 4.99 %, and the Bank made payments to Yountville. These payments were placed in an account which Yountville asserts it never accessed. Around October 2007, interest rates began to fall. Yountville's payments to the Bank under the swap were initially small, but as interest rates continued to fall the payments increased dramatically. To date Yountville has paid over $800,000 to the Bank pursuant to the agreement.

On these facts, plaintiff, invoking the diversity jurisdiction of this Court, filed this action for declaratory relief, restitution and damages. Dkt. # 1. The subsequent amended complaint asserts six claims for relief, including violation of the Washington Consumer Protection Act, RCW 19.86 *et seq.*; violation of the Washington State Securities Act, RCW 21.20 *et seq.*; negligent representation under New York common law, breach of contract under New York law, and unjust enrichment, together with a request for declaratory judgment. Dkt. # 86. The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states, and the amount in controversy is in excess of $75,000.

Defendant has now moved for summary judgment as to all claims. The individual claims shall be addressed separately.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 4

ANALYSIS

Summary judgment should be rendered "if the pleadings, discovery and disclosure material on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence is viewed in the light most favorable to the non-moving party. *Id.* "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F. 3d 1216, 1221 (9th Cir. 1995). It should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to prevent summary judgment. *Triton Energy Corp.*, 68 F. 3d at 1221.

I. Declaratory Judgment

Plaintiff requests a declaratory judgment finding that there was no mutual assent to the swap, and it should be rescinded and declared void and unenforceable due to the failure of a condition precedent to occur. First Amended Complaint, ¶ 5.3. Plaintiff argues that their performance (the payments made to the Bank under the Swap Agreement) should be excused because the purpose of the agreement has been frustrated, and that all money paid by either side to the other should be returned.

The basis of plaintiff's claim for a declaratory judgment is the assertion that the interest rate swap was necessarily tied to the construction loan, and that closing of the loan was a condition precedent to the agreement. There is no merit to this contention. Yountville principals Philip Sherburne and Doug Christiansen were informed in writing at presentations given by Mr. Taylor on October 17, 2006 and November 30, 2006, that the swap would continue in effect if the contemplated loan did not close. The written copy of the presentation stated,

> Once a forward starting swap has been executed telephonically, regardless of whether the underlying financing closes or funds, the value of the swap is subject to market conditions.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 5

> Should part or all of the swap be terminated prior to swap maturity, there will be an associated termination value that the counterparty owes or is owed.

Declaration of Logan Taylor, Dkt. # 27, Exhibit B, p. 9; Exhibit D, p. 13. The advisory was repeated on January 22, 2007 in a revised written copy sent to both Mr. Sherburne and Mr. Christiansen. *Id.*, Exhibit E, p. 11. Moreover, the agreement itself contains an integration clause stating that "This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supercedes all oral communications and prior writings with respect thereto." Declaration of Phil Sherburen, Dkt. # 20, Exhibits 6, ¶ 8(a). Under Washington's parol evidence rule, this integration clause in the swap agreement bars the consideration of plaintiff's previous understanding regarding the relationship between the swap and the proposed loan. *Denny's Restaurants, Inc. v. Sec. Union Title Ins. Co.*, 71 Wn.App. 194, 202, 859 P.2d 619 (1993). Plaintiff has not argued for any exception to that rule in this case.

Plaintiff admits that it has been "unable to find any case law regarding the enforceability of speculative interest rate swaps like this one." Plaintiff's response, Dkt. # 59, p. 20. The complete lack of case law on this subject may well suggest that it does not present an issue worthy of litigation. Plaintiff's arguments for declaring the swap agreement void and unenforceable are untenable, and the Court shall grant summary judgment to defendant on the declaratory judgment claim.

II. Unjust Enrichment

Plaintiff asserts in this claim that defendant "received monies as a result of the Interest Swap" and "wrongfully accepted and retained these benefits to the detriment of Plaintiff." Amended Complaint, Dkt. # 86, ¶ 6.2. Defendant correctly contends that the existence of a valid contract between the parties precludes the claim for unjust enrichment. *See, Chandler v. Washington Toll Bridge Authority*, 17 Wash. 2d 591, 604 (1943). Having found the swap agreement an enforceable contract, the Court finds plaintiff's unjust enrichment claim without merit, and grants summary judgment to defendant on this claim.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 6

III. Consumer Protection Act Claim

Plaintiff's claim that defendant's actions violated the Washington Consumer Protection Act ("CPA"), which declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW 19.86.020. The five elements of a CPA claim are "(1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) a public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780, 719 P.2d 531 (1986). Defendant, in moving for summary judgment on this claim, assert that plaintiff cannot demonstrate either an unfair or deceptive act or practice, or a public interest impact.

For conduct to qualify as an unfair or deceptive act or practice under the CPA, it must have the capacity to deceive "a *substantial portion of the public*." *Segal Co. (Eastern States), Inc., v. Amazon.com*, 280 F. Supp. 2d 1229, 1232 (W.D.Wash. 2003) (emphasis in original). *See also, Henery v. Robinson*, 67 Wash.App. 277, 289-91, 834 P.2d 1091 (1992) (an act or practice is "unfair or deceptive" under the CPA only if it has the capacity to deceive "a substantial portion" of the public.) The number of consumers who could conceivably find themselves in plaintiff's circumstances—securing a construction loan of $30 million to build a luxury hotel---is extremely small and "unable to qualify as 'a substantial portion of the public' under any reasonable definition of that term". *Swartz v. KPMG, LLC*, 401 F. Supp. 2d 1146, 1154 (W.D.Wash. 2004); *affirmed in part*, *Swartz v. KPMG*, 476 Fed. 3d 756, 761 (9th Cir. 2004). As a matter of law, conduct directed toward a small group cannot support a CPA claim. *Id.*, *citing Henery*, 67 Wash. App. at 291, 834 P.2d 1091.

Moreover, the public interest is not affected. Just as plaintiff cannot show that defendant's actions in this interest rate swap affect a substantial portion of the public, plaintiff cannot establish that the situation is one which affects the public interest. "The tribulations of multimillionaires are not the focus of the legislative intent behind the CPA; as a (very small) group, the extremely wealthy are neither unsophisticated nor easily subject to chicanery." *Swartz*, 401 F. Supp. 2d at 1154. *See also*, *Goodyear Tire & Rubber Co. v. Whiteman Tire Inc.*, 86 Wash.App. 732, 935 P.2d 628 (1997) (CPA claim dismissed on public interest grounds based on a finding that the plaintiff was "not representative of

bargainers vulnerable to exploitation." Id. at 745, 935 P.2d 628).

Summary judgment shall accordingly be granted as to the Washington CPA claim.

IV. <u>Washington State Securities Act Claim</u>.

Plaintiff asserts in this claim that defendant violated the Washington State Securities Act, RCW 21,20 *et seq*. ("Securities Act"). In order for there to be a violation, the interest rate swap agreement must be a "security" within the meaning of the Securities Act. The Act defines the term "security" to include

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture ...

RCW 21.20.005(12). Washington State courts have held that this definition "mirrors the definitions of the federal Securities Act of 1933, 15 U.S.C. § 77b (1988) and the Securities Exchange Act of 1934, 15 U.S.C. § 78c (1988)." *Cellular Engineering v. O'Neill*, 118 Wash. 2d 16, 24 (1991); *citing State v. Philips*, 108 Wash.2d 627, 630 (1987). Therefore, to determine the meaning of the term "security", the Washington courts look to federal law. *Id.* As defendants contend, the definition of "security" under federal law specifically excludes interest rate swaps. 15 U.S.C. § 77a(2A)(a), (b)(1); 15 U.S.C. § 78a(3A)(a), (b)(1).

Defendant's motion for summary judgment shall be granted as to this claim.

V. <u>Negligent Misrepresentation</u>

Plaintiff brings this claim under New York common law, contending that defendant possesses "unique and specialized expertise and superior knowledge with respect to interest swap agreements", and therefore had a duty to disclose any profit it would realize on entering the agreement, as well as to "correctly represent the manner and method by which it calculated any termination amount." Amended

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 8

Complaint, Dkt. # 86, ¶¶ 9.2, 9.3. Defendant asserts that plaintiff's assumption that New York law applies to this tort claim is not necessarily correct, but suggests that it is not necessary to engage in a choice of law analysis because the elements of the tort are essentially the same whether under New York or Washington law.

Under New York law, the elements of a claim of negligent misrepresentation are (1) a duty, as a result of a special relationship between the parties, to provide correct information; (2) a false representation made by a defendant who knew or should have known that the statement was incorrect; (3) the information was known by the defendant to be desired by the plaintiff for a special purpose; (4) the plaintiff intended to rely upon the information; and (5) the plaintiff did in fact reasonably rely on the information to his detriment. *Hydro Investors v. Trafalgar Power, Inc.*, 227 F. 3d 8, 20 (2d Cir. 2000).

Defendant contends that plaintiff cannot demonstrate the necessary "special relationship" because a commercial relationship does not qualify as a matter of law. The New York courts have found that the relationship between a bank and a borrower is the "very epitome of an arm's length commercial transaction." *JP Morgan Chase Bank v. Winnick, et al.*, 350 F. Supp. 2d 393, 400 (S.D.N.Y. 2004). In actions involving the contractual duties of financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory. *Deutsche Bank Securities, Inc., v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008).

Defendant further contends that even if the special relationship could be demonstrated, plaintiff has not identified the source of any duty on the part of the Bank to disclose the profit it would make on the swap. Further, the misrepresentations or omissions of which plaintiff complains involve statements made by Mr. Taylor regarding future events—the possible profit to the Bank from payments made under the swap, and the possible profit to the Bank from a payment made to "unwind" or terminate the swap. A negligent misrepresentation claim turns on statements regarding existing facts; a description of events which may occur in the future cannot support the claim. *Hydro Investors v. Trafalgar Power, Inc.*, 227 F. 3d at 21. "An alleged misrepresentation must be factual and not 'promissory or related to future events.' " *Eternity Global Master Fund Limited v.Morgan Guaranty Trust Co. of New York*, 375 F. 3d 168, 188-89 (2d Cir. 2004) (*quoting Hydro Investors,* 227 F. 3d at 20.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 9

In opposing defendant's arguments on this claim, plaintiff has presented an eloquent indictment of interest rate swaps and other financial derivatives, and their role in "the recent financial meltdown." Plaintiff's Opposition, Dkt. # 96, p. 7-8. However, despite the allegation that the Bank "has repeatedly engaged in unfair and deceptive practices," plaintiff has not pointed to any actual statement or omission that would present the required elements of a claim of negligent misrepresentation. The statements and omissions of Mr. Taylor identified by plaintiff are, as defendant contends, not actionable because they are not representations of present facts. Further, plaintiff has not pointed to any facts which would satisfy the first element of the asserted claim: it has not identified any legal duty on the part of the Bank to disclose its potential profit from the transaction, and it has not demonstrated that this commercial relationship between borrower and lender was a "special relationship."

Under New York law, in order to state a claim for negligent misrepresentation, a plaintiff is required to allege that the speaker is bound to the other party "by some relation or duty of care." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir.2003). In ordinary commercial contexts, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996). However, where the duty arises in commercial contexts in which a contract exists, the duty attendant to that special relationship "must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island RR Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). In other words, "[i]f the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort." *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980).

Plaintiff relies on *Kimmell* for the assertion that a special relationship existed between plaintiff and defendant regarding the interest rate swap because the Bank "possessed unique and specialized expertise" in this area. In *Kimmell,* the New York court explained that "[i]n a commercial context, a

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 10

duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for the information.'" *Kimmell*, 89 N.Y.2d at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450, quoting *International Prods. Co. v. Erie R.R. Co.*, 244 N.Y. 331, 338, 155 N.E. 662 (1927) (alteration in original). However, as other courts have noted, *Kimmell* did not represent a departure from the traditional understanding that a special relationship is required in order to state a claim for negligent misrepresentation. *See Dallas Aerospace, Inc., v. CIS Air Corporation,*, 352 F.3d 775. 788-89 (2d Cir. 2003). Thus, *Kimmell* neither abolished the requirement of a special relationship, nor loosened the requirement that such relationship must arise due to some factor extraneous to the contract's terms. Plaintiff has not identified factors extraneous to the swap agreement terms that would create the necessary special relationship.

Finally, plaintiff argues that at the very least, the question of whether a special relationship exists is a question of fact. It is true that several cases have so characterized it. *See, e.g.*, *Suez Equity Investors*, 250 F.3d at 103-04; *Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.*, 247 F.Supp.2d 352, 366-67 (S.D.N.Y.2002); *Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450. But these cases were decided on very different facts. For example, in *Suez Equity Investors*, a case involving alleged misrepresentation between investors and a healthcare financing venture, the court specifically found that "plaintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiff, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." 250 F.3d at 103. Similarly, in *Wells Fargo*, which involved a dispute between the lessee and lessor of a aircraft, the complaint alleged that several of the defendant's agents "made expert representations about maintenance costs," "had unique expertise in the intended conversion of Airbus 300 aircraft from passenger to cargo use," and "misrepresented the historical maintenance costs and the good mechanical condition of the planes." *Wells Fargo*, 247 F.Supp.2d at 366-67. On these facts, the court assumed that "these somewhat sparse allegations suffice, at least at the pleading stage" to withstand a motion to dismiss, "[s]ince the determination of whether a special relationship exists is essentially a factual inquiry." *Id*. at 367.

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 11

Here, however, we are at the summary judgment stage, and well beyond the point whereسparse allegations will suffice. Even viewing the facts alleged by plaintiff in the most favorable light, the Court finds that plaintiff has failed to allege either a relationship that is in any way distinct from that between a "plain-vanilla" borrower and lender, or a duty of care arising from any source external to the swap agreement. The law does not impose liability for negligent misrepresentations in such a context. Plaintiff's claim for negligent misrepresentation must therefore be dismissed.

VI. Breach of Contract

Plaintiff's claim for breach of contract is also brought under New York common law. Much of this claim relates to the "point spread" between the interest rate given plaintiffs on the swap (4.99%) and the rate at which the Bank obtained the swap (4.72%). Plaintiff alleges in the Amended Complaint that defendant "acted unfairly and in bad faith" when it failed to disclose that it "had charged Plaintiff a marketing profit," and when it failed to disclose the manner, amount and existence of the point spread. Amended Complaint, Dkt. # 86, ¶ 10.2. Plaintiff also contends there was bad faith with respect to the "back end" of the swap, meaning the calculation of the amount necessary to terminate or unwind the swap prior to the contract termination date. Plaintiff alleges that defendant acted in bad faith when it failed to inform plaintiff that it would charge a marketing profit upon early termination of the swap; when it failed to disclose the manner and method it used to determine the amount for the early termination; and by instructing its employees not to terminate the swap with plaintiff in order to recoup legal fees related to the loan transaction. *Id.*, ¶ 10.4. Finally, plaintiff alleges that defendant acted in bad faith by encouraging plaintiff to pursue the loan application "even though Defendant believed that Plaintiff's chances for funding were low." *Id.*, ¶ 10.5.

An implied covenant of good faith and fair dealing inheres in every New York contract. *See Travellers Int'l., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (*citing Van Valkenburgh, Nooger & Neville v. Hayden Pub. Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972)). Breach of the implied duty is thus merely a breach of the underlying contract. *National Market Share, Inc., v. Sterling National Bank*, 392 F. 3d 520, 525 (2d Cir. 2004). The scope of potential liability for

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 12

breach of the covenant is quite narrow: such a breach cannot give rise to additional liability if it merely replicates the liability for breach of the underlying contract. *Apfel v. Prudential-Bache Secs., Inc.*, 183 A.D.2d 439, 440, 583 N.Y.S.2d 386, 387 (1st Dep't 1992). Nor can it create new contractual rights or impose additional duties. *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *see also Warner Theatre Assocs. v. Metropolitan Life Ins. Co.*, No. 97-4914, 1997 WL 685334, at *3 (S.D.N.Y., Nov. 4, 1997), *aff'd*, 149 F.3d 134 (2d Cir.1998). The implied covenant of good faith and fair dealing is "limited to performance under a contract and does not encompass future dealings or negotiations between the parties." *Travelers Indemnity Co. of Illinois v. CDL Hotels USA, Inc.*, 332 F. Supp. 2d 482, 494 (S.D.N.Y. 2004).

Breach of the covenant of good faith and fair dealing may occur where the contract is not technically breached, but one party has acted to destroy or injure the right of the other party to receive the benefit of the contract. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F.Supp.2d 711, 735-36 (S.D.N.Y.2000), *aff'd*, 294 F.3d 383 (2d Cir.2002); *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F.Supp. 808, 815-16 (S.D.N.Y.1994). Here, neither the Bank's failure to disclose the point spread on entering the swap, nor the representations or omissions about the calculation for terminating the swap injured plaintiff's ability to receive the benefits of the contract, as there was no contractual requirement that either be disclosed.

> In opposing defendant's arguments for summary judgment on this claim, plaintiff argues that
> [t]he Bank breached the covenant of good faith and fair dealing when it failed to inform Yountville of the severe consequences of entering into the interest rate swap if the loan failed to close, material information that Yountville justifiably expected would be conveyed. The Bank further breached the covenant of good faith and fair dealing when it failed to tell Yountville about Yountville's six-figure asset, and contemporaneously encouraged Yountville to pursue a loan with the Bank that the Bank knew would never close. As a result, the Bank realized a windfall profit, and Yountville was deprived of the benefit of its bargain.

Plaintiff's Supplemental Opposition, Dkt. # 98, p. 21 (internal citations to the record omitted).

There is no merit to these arguments. The "severe consequences" to plaintiff from entering the interest rate swap have occurred not because the loan from the Bank failed to close, but because of the unforeseen precipitous drop in interest rates that occurred several months later. These consequences are

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 13

wholly independent of the loan; they result directly from the terms of the agreement itself. As to the benefit of the bargain, plaintiff has failed to demonstrate that it was deprived. Plaintiff received exactly what it bargained for—a fixed rate of 5 % or better on a notation amount. While that amount may have been determined in anticipation of the loan closing, it was not tied to it. Indeed, the loan later obtained by plaintiff from Zions Bank was for a greater amount to cover the higher construction costs. Finally, as to the "six-figure asset" (which the Court presumes refers to the $239,000 realized by the Bank on the point spread), the Bank had no duty to disclose that it obtained the swap at a lower rate than it offered to plaintiff. In the absence of a duty to disclose, there was no breach. As plaintiff has failed to demonstrate that defendant acted to destroy or injure its right to receive the benefit of the contract, summary judgment shall be granted to defendant on this claim.

## CONCLUSION.

Defendant's motions for summary judgment is GRANTED as to all six claims in the Amended Complaint, and this action is DISMISSED. The pending motion to exclude testimony of William Sarsfield (Dkt. # 73) is STRICKEN as moot.

Dated this 28 day of July, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE